UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THOMAS E. PEREZ, Secretary of Labor,
United States Department of Labor,
    Plaintiff,

     v.                              CIVIL ACTION NO.
                                         10-11943-GAO

FATHALLA M. MASHALI,
    Defendant.

**REPORT AND RECOMMENDATION RE:
SECRETARY OF LABOR'S MOTION FOR SUMMARY JUDGMENT
(DOCKET ENTRY # 32); FATHALLA M. MASHALI'S CROSS-
MOTION FOR SUMMARY JUDGMENT
(DOCKET ENTRY # 48)**

**April 28, 2015**

**BOWLER, U.S.M.J.**

    Plaintiff Thomas E. Perez, Secretary of Labor, United States Department of Labor ("the Secretary"), moves for summary judgment against defendant Fathalla M. Mashali ("defendant") in this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109(a), 1132(a)(2), based on various breaches of fiduciary duty and prohibited transactions. In addition to seeking summary judgment on liability and damages, the Secretary seeks a determination that defendant's debt for losses resulting from his fiduciary breaches is not dischargeable in his personal bankruptcy proceeding under 11 U.S.C. § 523(a)(4) ("section 523(a)(4)").

On March 5, 2015, more than four months after the deadline
to file a summary judgment motion, defendant filed a motion
seeking summary judgment in his favor on liability and that any
judgment is dischargeable in bankruptcy.  After conducting a
hearing on March 25, 2015, this court took the motions (Docket
Entry ## 32, 48) under advisement.

<u>PROCEDURAL BACKGROUND</u>

The complaint alleges that defendant, a fiduciary and a
party in interest under the Northern Rhode Island Anesthesia
Associates, P.C. Retirement Plan and Trust ("the Plan"), engaged
in prohibited transactions by allowing the Northern Rhode Island
Anesthesia Associates, P.C. ("NRIAA") and its subsidiary
companies, all owned by defendant, to retain employee
contributions after they became Plan assets.  The employee
contributions include those made "via salary reduction
agreements" as "deferred arrangements" within the meaning of the
Internal Revenue Code ("the Tax Code"), 26 U.S.C. § 401(k)
("section 401(k)"), and contributions denoted as "profit-sharing
contributions" in employee contracts.[1]  (Docket Entry # 1, ¶¶ 15,
16).  The complaint additionally contends that defendant failed
to undertake measures to collect mandatory qualified non-

---

[1]  Tax Code regulations define a profit sharing plan as, "A
plan established and maintained by an employer to provide for the
participation in his profits by his employees or their
beneficiaries."  26 C.F.R. § 1.401-1(b)(1)(ii).

elective contributions ("QNEC") for the years 2006 and 2007.

The Secretary's summary judgment motion focuses on the misconduct via-à-vis the employee contributions in the form of deferred arrangements and defendant's mischaracterization of them as discretionary contributions by the employer and/or profit sharing contributions. (Docket Entry # 33, n.7). In particular, the Secretary seeks summary judgment on liability and damages in the amount of $1,170,986 based on salary deferred arrangements in 31 employee contracts that reduced employees' compensation by 15% for allocation to the Plan. (Docket Entry ## 32, 33, 41, 54).

The complaint sets out a cause of action under section 1109 ("section 1109") against defendant for: (1) violating his fiduciary duty under 29 U.S.C. § 1104(a)(1)(A) ("section 1104(a)(1)(A)") to discharge his duties to the Plan solely for the purpose of "providing benefits to participants and their beneficiaries"; (2) violating his fiduciary duty under 29 U.S.C. § 1104(a)(1)(B) ("section 1104(a)(1)(B)") to exercise "the care, skill, prudence and diligence" of "a prudent man"; (3) engaging in prohibited transactions under 29 U.S.C. § 1106(a)(1)(B) ("section 1106(a)(1)(B)") by causing or permitting the lending of Plan assets to defendant, NRIAA and the subsidiary companies

as parties in interest;[2] (4) engaging in prohibited transactions under 29 U.S.C. § 1106(a)(1)(D) ("section 1106(a)(1)(D)") by causing or permitting the transfer of Plan assets to parties in interest, namely, defendant, NRIAA and the subsidiary companies; (5) engaging in prohibited transactions by dealing with "assets of the plan in his own interest or for his own account" under 29 U.S.C. § 1106(b)(1) ("section 1106(b)(1)"); and (6) violating his fiduciary duty "by acting in his individual capacity and in his capacity as a representative of his companies where those interests were adverse to the interests of the Plan" under 29 U.S.C. § 1106(b)(2) ("section 1106(b)(2)"). (Docket Entry # 1, ¶¶ 17-27).

On December 16, 2008, defendant "filed for personal bankruptcy protection under Chapter 11 of the Bankruptcy Code" in  the United States Bankruptcy Court for the District of Massachusetts ("the bankruptcy court").  On February 10, 2010, the bankruptcy court converted the matter to a chapter seven filing.  (Docket Entry # 34, ¶ 31) (Docket Entry # 50, ¶ 31).

---

[2]  The complaint alleges a violation of section 1106(a)(1)(B) "by causing or permitting the *transfer* to or use by parties in interest."  (Docket Entry # 1, ¶ 24) (emphasis added). Section 1106(a)(1)(B) prescribes the prohibited transaction of the "*lending* of money or other extension of credit between the plan and a party in interest."  29 U.S.C. § 1106(a)(1)(B) (emphasis added).  A separate section, 29 U.S.C. § 1106(a)(1)(D), prescribes the transfer of Plan assets to parties in interest and the Secretary separately alleges that defendant violated this subsection.

On June 30, 2010, the Secretary filed an adversary complaint in the bankruptcy court related to the chapter seven proceeding in order to determine that defendant's debt for the contributions was not dischargeable under section 523(a)(4) based on fraud or defalcation. (Docket Entry # 1, ¶ 14, sent. 2); (Docket Entry # 6, ¶ 14, sent. 2) (Docket Entry # 40-10). After filing this action, the Secretary filed a motion in the bankruptcy court to withdraw the adversary complaint and the clerk of the bankruptcy court transmitted the matter to the clerk of the District Court for the District of Massachusetts. See MLBR 5011-1. On December 6, 2010, the clerk filed the transmitted motion to withdraw under 11 U.S.C. § 157(d) in Civil Action No. 10-2152-GAO. On January 14, 2011, the court in Civil Action No. 10-2152-GAO allowed the Secretary's motion to transfer the case and consolidate it with this action.

"On December 30, 2008, NRIAA filed for Chapter 7 (no asset) bankruptcy protection" in the bankruptcy court. A number of defendant's "other affiliated entities (Anesthetics of Brockton P.C., Anesthetics of Lowell P.C., Anesthetics of Lawrence P.C., . . . Anesthetics of Worcester P.C., Anesthetics of Massachusetts P.C.," and NRIAA) also filed for bankruptcy protection under chapter seven. (Docket Entry # 34, ¶ 30) (Docket Entry # 50, ¶ 30).

The Secretary filed this action on November 12, 2010. He

relies on an exemption from the automatic stay because he is enforcing the "police or regulatory power" of "a governmental unit" within the meaning of 11 U.S.C. § 362(b)(4).

STANDARD OF REVIEW

Summary judgment is designed "'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" <u>Tobin v. Federal Express Corp.</u>, 2014 WL 7388805, at *2 (1st Cir. Dec. 30, 2014) (quoting <u>Wynne v. Tufts University School of Medicine</u>, 976 F.2d 791, 794 (1st Cir. 1992)). It is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). It is inappropriate "if the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side." <u>Pierce v. Cotuit Fire District</u>, 741 F.3d 295, 301 (1st Cir. 2014).

"Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" <u>Green Mountain Realty Corp. v. Leonard</u>, 750 F.3d 30, 38 (1st Cir. 2014) (quoting <u>Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London</u>, 637 F.3d 53, 56 (1st Cir. 2011)). In reviewing a summary

judgment motion, a court may examine "all of the record materials on file," <u>Hicks v. Johnson</u>, 755 F.3d 738, 743 (1st Cir. 2014), "including depositions, documents, electronically stored information, affidavits or declarations . . . or other materials." Fed.R.Civ.P. 56(c)(1).

The Secretary submits a LR. 56.1 statement of undisputed facts to support the motion.  In response and in support of his summary judgment motion, defendant filed a LR. 56.1 statement. The Secretary then filed a response to defendant's LR. 56.1 statement.  Uncontroverted statements of fact in a LR. 56.1 statement are considered undisputed.  <u>See</u> LR. 56.1 ("[m]aterial facts of record set forth in the statement . . . will be deemed . . . admitted by opposing parties unless controverted by the statement required to be served by opposing parties"); <u>Stonkus v. City of Brockton School Department</u>, 322 F.3d 97, 102 (1st Cir. 2003) (citing LR. 56.1 and deeming admitted undisputed material facts that plaintiff failed to controvert); <u>see</u> <u>also</u> <u>Cochran v. Quest Software, Inc.</u>, 328 F.3d 1, 12 (1st Cir. 2003).

Where, as here, the parties filed cross motions for summary judgment, the court must "determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." <u>Barnes v. Fleet Nat'l Bank, N.A.</u>, 370 F.3d 164, 170 (1st Cir. 2004).  Each summary judgment motion is reviewed separately and factual disputes are resolved in favor of the nonmoving party.  <u>See</u> <u>OneBeacon America Ins. Co. v. Commercial</u>

<u>Union Assurance Co. of Canada</u>, 684 F.3d 237, 241 (1st Cir. 2012) (viewing cross motions for summary judgment "'separately,' in the light most favorable to the non-moving party, and draw[ing] all reasonable inferences in that party's favor").

Finally, defendant filed two exhibits (Docket Entry ## 50-1, 50-2) which the Secretary maintains are not authenticated (Docket Entry # 54, p. 7). <u>See</u> Fed R. Evid. 901. The exhibits are not self authenticating or otherwise properly authenticated under F.R.E. 901. <u>See</u> <u>Asociacion De Periodistas De Puerto Rico v. Mueller</u>, 680 F.3d 70, 79 (1st Cir. 2012) (authentication requires "a 'reasonable probability' that the item in dispute is what its proponent claims"); <u>DiMaria v. Concorde Entertainment, Inc.</u>, 2014 WL 991567, at *3 (D.Mass. March 12, 2014) ("[e]ach document submitted in support of summary judgment must either be properly authenticated or must be self-authenticating"). With the Secretary having objected to the lack of authentication, it was incumbent upon defendant to seek leave to file authenticating evidence. Accordingly, the exhibits, which show that in 2004 and 2005 a number of participating employers made Plan contributions of 3% of the employees' pay and separate contributions of 12% of their pay, are not part of the summary judgment record. Alternatively, including the documents in the record would not alter the recommended decision on the summary judgment motions.

<u>FACTUAL BACKGROUND</u>

8

Defendant, an anesthesiologist, was licensed to practice medicine in Massachusetts from 1996 to 2013 and in Rhode Island from 1996 to 2014.  In August 2001, he established NRIAA, a privately held company incorporated in Rhode Island.  Defendant is "the sole owner and President of NRIAA." (Docket Entry # 34, ¶ 3) (Docket Entry # 50, ¶ 3).  NRIAA is an "an employer[] within the meaning of ERISA," 29 U.S.C. § 1002(5), and "provided administrative and billing services" for NRIAA's subsidiary companies.[3]  (Docket Entry # 1, ¶¶ 4, 5) (Docket Entry # 5, ¶¶ 4, 5) (Docket Entry # 34, ¶ 4) (Docket Entry # 50, ¶ 4).

During the relevant time period, defendant owned the following subsidiary companies of NRIAA:  Blackstone Valley Emergency Physicians Associates P.C. ("Blackstone"); Anesthetics of Massachusetts P.C.; Northern Rhode Island Medical Group P.C.; Helios Medical Group Inc.; Northern Rhode Island Endoscopy P.C.; New England Pain Associates P.C.; Anesthetics of Lowell P.C.; Anesthetics of Brockton P.C.; Anesthetics of Worcester P.C.; Anesthetics of Nantucket P.C.; New England Cardiac Anesthesia Associates P.C.; Anesthetics of Lawrence P.C.; and Anesthetics of New Hampshire P.C. (Docket Entry # 1, ¶ 13) (Docket Entry # 5, ¶ 13).  At various times, all of these subsidiary companies adopted the Plan and became participating employers.

---

[3]  The parties agree on the above except to the extent that NRIAA ceased acting as an employer when it filed for bankruptcy protection in the fall of 2008.

Defendant established the Plan on August 4, 2001. The stated purpose of the Plan was "to provide retirement benefits" as well as pre-retirement benefits "for the exclusive benefit of its participants and their beneficiaries, employees of NRIAA and the subsidiary companies that adopted the Plan, as participating employers." (Docket Entry # 1, ¶ 8) (Docket Entry # 5, ¶ 8) (Docket Entry # 36-5, p. 6).[4] The Plan is "an employee pension benefit plan within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A)." (Docket Entry # 1, ¶ 7) (Docket Entry # 5, ¶ 7). "The Plan Documents consist of a National Retirement Plan Advisors, Inc. 401(k) Select Profit Sharing Plan Volume Submitter Document, and amendments thereto, and the Adoption Agreement, and amendments thereto." (Docket Entry # 34, ¶ 7) (Docket Entry # 50, ¶ 7).

NRIAA is the sponsor of the Plan, a named fiduciary under the Plan and the administrator of the Plan. (Docket Entry # 1, ¶ 9) (Docket Entry # 5, ¶ 9) (Docket Entry # 34, ¶ 9) (Docket Entry # 50, ¶ 9) (Docket Entry # 36-5, § 16.02(e)). National Plan Advisors, Inc. is "the Plan's third party administrator." (Docket Entry # 35, ¶ 23). Defendant is "the only named Plan Trustee" (Docket Entry # 34, ¶ 10) (Docket Entry # 50, ¶ 10) and is a named fiduciary under the Plan. (Docket Entry # 1, ¶ 11)

---

[4] Page numbers refer to the page numbers as docketed as opposed to the page or Bates number of the actual document.

10

(Docket Entry # 5, ¶ 11) (Docket Entry # 36-5, ¶ 16.01).
Defendant "admits that [he] is, and was a party in interest
within the meaning of ERISA § 3(14)(A) and (C), 29 U.S.C. §
1002(14)(A) and (C)."  (Docket Entry # 1, ¶ 12)  (Docket Entry #
5, ¶ 12).

As Plan trustee, defendant "signed the Plan Adoption
Agreement and its amendments" and executed transactions
involving Plan assets and "corporate resolutions adopting the
Plan and its amendments."  (Docket Entry # 34, ¶¶ 11, 13, 14)
(Docket Entry # 50, ¶¶ 11, 13, 14).  He also signed "the Plan's
annual Form 5500's returns."[5]  (Docket Entry # 34, ¶ 12) (Docket
Entry # 50, ¶ 12) (Docket Entry # 50-6, p. 3).  Defendant also
"made administrative and funding decisions for the Plan."
(Docket Entry # 34, ¶ 15) (Docket Entry # 50, ¶ 15).

"From August 4, 2001 to July 1, 2003," discretionary
employer contributions "constituted the only means for funding
the Plan."  (Docket Entry # 34, ¶ 17) (Docket Entry # 50, ¶ 17)
(Docket Entry # 36-5, §§ 6.01-6.05) (Docket Entry # 36-6, p. 4)
(Docket Entry # 36-8, p. 4).  As stated in the Plan,

---

[5]  Form 5500s are annual forms for employee benefit plans
that companies file with the Secretary under ERISA, 29 U.S.C. §
1024, and with the Internal Revenue Service.  See Petrone v. Long
Term Disability Income Plan for Choices Eligible Employees of
Johnson & Johnson and Affiliated Companies, 935 F.Supp.2d 278,
289-290 (D.Mass. 2013); see also Daniels v. Agin, 736 F.3d 70, 76
(1st Cir. 2013) ("Form 5500 is the annual return for employee
benefit plans").  The record includes a number of annual 5500
forms for the Plan.  (Docket Entry ## 50-3, 50-4, 50-5, 50-6).

"contributions by Participants are not currently permitted."
(Docket Entry # 36-5, § 4.02(c)).  NRIAA was a participating
employer during this time period.  As set out in an adoption
agreement captioned "Profit Sharing Prototype Plan and Trust"
effective August 4, 2001, the employer made the discretionary
contributions based on the employee's compensation.  (Docket
Entry # 34, ¶ 18) (Docket Entry # 50, ¶ 18) (Docket Entry # 36-
6).  Under an adoption agreement effective January 1, 2003, the
Plan likewise permitted "discretionary Employer
contribution[s]."  (Docket Entry # 36-8, pp. 4-5).

The corresponding language in the Plan applicable to
discretionary employer contributions reads as follows:

ARTICLE 6-DISCRETIONARY EMPLOYER CONTRIBUTIONS

6.01 In General.

For any Plan Year, the Employer may elect to make an
additional contribution which shall be allocated as
provided for in this Article.  An allocation under this
Article shall be allocated to . . . the separate subaccount
established and maintained for each Participant with
respect to the Participant's interest in the Plan resulting
from discretionary Employer contributions.  The amount in
this subaccount shall Vest according to the Plan's vesting
schedule . . ..

(Docket Entry # 36-5).  A separate article in the Plan, i.e.,
article seven, describes "other employer contributions."
(Docket Entry # 36-5, §§ 7.01-7.05) (capitalization omitted).
These include "Matching Contributions," "Employer Booster
Contribution[s]" and "Top Heavy Contributions."  (Docket Entry #

36-5, §§ 7.01, 7.02, 7.04).  Article four provides a brief overview of employer and employee contributions.

The adoption agreement effective January 1, 2003, is titled, "401(k)-Select Profit Sharing Plan."[6]  In addition to allowing discretionary employer contributions, it alters the allocation formula and eligibility requirements for participants.  It does not provide for matching contributions or employer fixed contributions of 3% or employee elective deferrals of compensation.  The amendment adds the following subsidiary companies as participating employers:  Northern Rhode Island Medical Group (effective January 1, 2007); Helios Medical Group Inc. (effective January 1, 2005); Northern Rhode Island Endoscopy P.C. (effective January 1, 2006); New England Pain Associates P.C. (effective January 1, 2006); Anesthetics of Lowell P.C. (effective January 1, 2005); Anesthetics of Brockton P.C. (effective July 1, 2005); Anesthetics of Worcester P.C. (effective January 1, 2006); Anesthetics of Nantucket P.C. (effective January 1, 2006); New England Cardiac Anesthesia Associates P.C. (effective January 1, 2006); Anesthetics of Lawrence P.C. (effective July 1, 2006); and Anesthetics of New Hampshire P.C. (effective January 1,2007).  Blackstone and Anesthetics of Massachusetts P.C. previously adopted the Plan.

---

[6]  The full title of the amendment is "Adoption Agreement for National Retirement Plan Advisors, Inc. 401(k)-Select Profit Sharing Plan Volume Submitter Document."  (Docket Entry # 36-8).

(Docket Entry # 35, ¶ 16).

Under an adoption agreement effective July 1, 2003, for the first time "the Plan added employee elective deferral contributions (to individual 401(k) accounts) and Employer Fixed Contributions," known as "'qualified non-elective contributions'" or "QNECs," of "3 percent of each Plan participant's compensation." (Docket Entry # 34, ¶¶ 21, 22) (Docket Entry # 50, ¶¶ 21, 22) (Docket Entry # 36-9). As to the employee elective deferral contributions, which are outlined in section C2, the employer could choose one of several contribution levels. The chosen designation allowed participating employees to elect to have up to 100% of their compensation deferred. (Docket Entry # 36-9) (Docket Entry # 35, ¶ 19). The instructions in section C2 explain that, "Safe Harbor 401(k) plans must elect [this] alternative . . .."[7] The language in section C2 states that, "The Employer *shall* contribute the amount by which an eligible Participant has elected to have Compensation deferred." (Docket Entry # 36-9, ¶ C2) (emphasis added). The same section states that, "Compensation shall be determined on the basis of each payroll period during which *an effective salary reduction agreement* is

---

[7] Defendant points out that NRIAA converted the Plan "to an IRS 'safe harbor' design" in July 2003. (Docket Entry # 49).

14

on file with the Employer."[8]  (Docket Entry # 36-9, ¶ C2)
(emphasis added).

Section C2 is labeled "Employee Elective Deferrals."
(Docket Entry # 36-9).  The Plan addresses employee elective
deferrals in article five, which is similarly captioned "ARTICLE
5-EMPLOYEE ELECTIVE DEFERRALS."  (Docket Entry # 36-5).  Section
5.01, in pertinent part, states:

5.01 In General

The Employer shall contribute an amount equal to the amount
by which an Active Participant elects *to reduce the
Compensation* which would otherwise be paid to him.  This
amount shall be allocated to the Participant's "Elective
Deferral Subaccount," which is the separate subaccount
established and maintained for each Participant . . . The
amounts in this subaccount are 100% immediately Vested and
are subject to the 401(k) Vesting and Distribution
Requirements.

(Docket Entry # 36-5, § 5.01) (emphasis added).

Turning to the employer fixed contributions, which are set
out in section C4, the relevant language reads that, "An
Employer Fixed Contribution of 3% will be provided for each
individual who was an Active Participant during the Plan Year."
(Docket Entry # 34, ¶ 21) (Docket Entry # 50, ¶ 21) (Docket
Entry # 36-9, ¶ C4).  The Plan addresses elections made under
section C4 of an adoption agreement in article seven, which is
captioned "Other Employer Contributions," and in article four,

---

[8]  The Secretary submits that the various employment
contracts include deferred salary arrangements mislabeled as
"Profit Sharing Contributions."  (Docket Entry # 33).

15

which is captioned "Contributions to the Plan." (Docket Entry # 36-5, §§ 7.01-7.05). Section 7.02(4) of article seven provides as follows:

> (c) If so elected in Section C4 of the Adoption Agreement, the Employer will contribute, for each individual who was an Active Participant during the Plan year, a Fixed Contribution of 3% of Compensation to the Participant's Qualified Non-Elective Contribution Subaccount. Amounts in the Qualified Non-Elective Subaccount shall be immediately 100% Vested and shall by subject to the 401(k) Vesting and Distribution Requirements.

(Docket Entry # 36-5, § 7.02(c)). Section 4.01, captioned "Contributions by the Employer," states that, "For each Plan Year, the Employer shall determine the amount it *shall* contribute to the Plan . . . the Employer's contribution will *not* be less than the amounts needed . . . to contribute the amount of an Elective Deferrals" and "to make any Fixed Contribution described in Section 7.02(c) . . .." (Docket Entry # 36-5, § 4.01) (emphasis added).

Simply stated, the July 2003 amendment allowed participating employees to defer their salary into an "Elective Deferral Subaccount."[9] In making the contribution, the employer determined the amount of compensation deferred on the basis of "an effective salary reduction agreement." (Docket Entry # 36-9, ¶ C2) (Docket Entry # 34, ¶ 21) (Docket Entry # 50, ¶ 21)

---

[9] "Contributions to a 401(k) plan are termed "elective deferrals." Loh v. Richardson-Browne, 2010 WL 5055787, at *1 (D.N.J. Dec. 2, 2010) (citing Treas. Reg. § 1.402(g)-1(b)).

(Docket Entry # 36-9) (Docket Entry # 35, ¶ 19) (Docket Entry # 36-5, § 5.01).

Defendant signed the amendment on behalf of the participating employers. (Docket Entry # 36-9). The amendment states that, by signing the amendment, these employers "adopt[ed] a 401(k)-Select Profit Sharing Plan for" participating employees. (Docket Entry # 36-9, sent. 1).

Thereafter, defendant, as president of various participating employers, entered into employment contracts with participating employees. (Docket Entry # 34, ¶ 19) (Docket Entry # 50, ¶ 19) (Docket Entry ## 38, 39). In fact, participating employers entered into a total of 148 contracts with participating employees.[10] (Docket Entry # 35, ¶ 35). An investigator in the Boston Regional Office of the Department of Labor, Employee Benefits Security Administration ("DOL Investigator") attests that, after reviewing the 148 contracts, 38 of the 148 employees with these contracts "elected to receive 15% compensation as an employer profit sharing contribution." (Docket Entry # 35, ¶ 35). The Secretary filed excerpts of the 38 contracts and calculates the requested $1,170,986 in damages based on 31 of these contracts and an assumption that they all

_____

[10]   Except for 38 of these employee contracts, the record fails to include the terms of these contracts.

contain the 15% election.[11]  (Docket Entry # 35, ¶¶ 35, 36).  In point of fact, only 16 of the 31 actual contracts for the 31 employees listed in the damages calculation chart contain a 15% election.[12]

Confining review to the 31 contracts that the Secretary uses to calculate damages (Docket Entry # 35, ¶¶ 36, 47) (Docket Entry # 41), these employee contracts set out varying benefits labeled in separate categories as "Profit Sharing Plan," "401 K Plan" and/or "Retirement Plan."  For example, four of the contracts allow the physician to elect both a "401 K Plan" and a "Retirement Plan."  (Docket Entry ## 38, 38-4, 38-7, 39-4).  Notably, these contracts do not mention a percentage although they do state that the "Retirement Plan" is provided "[o]n the same terms and conditions as other participating employees of the Employer's Plan."[13]  (Docket Entry ## 38, 38-4, 38-7, 39-4).

_____

[11]  In particular, based on this assumption, the DOL Investigator calculated damages based on the 31 contracts by using the lesser of 15% of an employee's compensation or the employee's contribution ascertained from W-2s and the applicable plan valuation.  (Docket Entry # 35, ¶¶ 35, 47-57) ((Docket Entry # 41).  In other words, the DOL Investigator and the Secretary calculated damages based in part on the assumption that all 31 employee contracts set out a 15% deferral of compensation.

[12]  One of the 31 contracts is not in the record.  It is an employment contract for Song Song, an employee listed on the DOL Investigator's damages calculation chart.  (Docket Entry # 41).

[13]  Because 110 of the 148 contracts are not in the record and the 38 contracts have varying terms, whether the above language in these four contracts ("same terms and conditions as other participating employees" of the Plan) means an employee election of 15% is not established as a matter of law.

18

Ten additional contracts also fail to specify a contribution percentage even though the Secretary assumed a 15% election as a basis to calculate damages. (Docket Entry ## 37-2, 37-3, 37-4, 37-7, 37-8, 38-1, 38-5, 38-6, 38-11, 39-10). Nine of these contracts offer a "Retirement Plan" and one offers a "Profit Sharing Plan." With minor variations in language, the ten contracts summarily provide the retirement or profit sharing benefit "[o]n the same terms and conditions as other participating employees of the Employer's Plans."[14] (Docket Entry ## 37-2, 37-3, 37-4, 37-7, 37-8, 38-1, 38-5, 38-6, 38-11, 39-10).

The remaining 16 contracts specify a 15% contribution.[15] Nine of these contracts allow the physician to elect a benefit described as either a "Retirement Plan" or as a "Profit Sharing Plan," all with similar language. These contracts specify a 15% contribution and denote the benefit as both a deduction from the physician's salary and a contribution to the Plan. With minor

---

[14]   See footnote 13.

[15]   The eight contracts that the Secretary did not use to calculate damages are evenly split in terms of providing for a 15% deduction and contribution to the Plan. Four of the contracts include this benefit. (Docket Entry ## 37-5, 37-10, 39, 39-1). Three of the contracts include a "401 K Plan" allowing the employee to "elect a salary deduction up to the annual IRS limits" as well as a "Retirement Plan." (Docket Entry ## 37-11, 38-10, 39-9). The remaining contract simply provides "other pension participation on the same terms and conditions as other participating Physician Assistant employees at cost to Employee." (Docket Entry # 39-7).

variations in language, they read as follows: "On the same terms and conditions as other participating employees of the Employer's Plan, Fifteen percent (15%) of the Physician's annual salary will be deducted from the Physician's annual salary and contributed to the Employer's Retirement Plan." (Docket Entry # 37, 37-1, 37-6, 37-9, 37-12, 38-8, 39-2, 39-5, 39-11).

Two of the remaining seven contracts allow a "Profit Sharing" benefit of a 15% *deduction* from the physician's salary. (Docket Entry ## 38-9, 39-12). They additionally permit a "401 K Plan" in the form of "a salary deduction."

In contrast, two other contracts describe a "profit sharing" benefit as a contribution by the employer of 15% of the employee's compensation. Without referring to a salary deduction, these contracts state that, "the Employer will contribute Fifteen (15%) percent of the Physician's salary to the Profit Sharing Plan."[16] (Docket Entry ## 39-3, 39-8). Three other contracts note that 15% "will be contributed to the Employer's Profit Sharing Plan" and refer to the maximum contribution of $31,500. (Docket Entry ## 38-2, 38-3, 39-6).

In short, the language of the employee contracts is not uniform in treating the profit sharing or retirement benefit as a contribution by the employer or as a deduction from the salary

---

[16] One of the contracts does not specify that the contribution will go to the Plan.

of the employee for contribution to the Plan.  A number of
contracts provide a benefit labeled as a "401 K Plan" and a
separate benefit labeled as a "Profit Sharing Plan."  Fifteen of
the 31 contracts used to calculate damages do not specify a 15%
deferral of compensation.  As noted, the adoption agreement
effective in July 2003 allowed for employee elective deferrals
of up to 100% of compensation and an employer fixed contribution
of 3% in lieu of a matching contribution.  Sections 5.01 and
7.02(c) of the Plan required the employer to contribute the
amount the employee elected into the employee's elective
deferral subaccount and the amount of the 3% fixed contribution
into the employee's qualified non-elective contribution
subaccount.  The Plan and the adoption agreements effective
August 2001 and January 2003 allow discretionary employer
contributions.

Separately, a number of employees elected pre-tax salary
deferrals in 2003 of varying percentages by completing employee
"salary Deferral 401(k) Plan Enrollment Forms."  (Docket Entry #
40-7).  Two of the 31 employees with the above described
employment contracts completed these forms.  One of the two
employees elected a different percentage deduction for 2004 than
he did for 2003.[17]

---

[17]  The Secretary provides this and other evidence to show
that the salary deferred arrangements in the employee contracts
were not irrevocable.  Defendant fails to address or identify

In 2004 and as set forth in the annual Form 5500 and accompanying summary report, the Plan had a total income of $1,089,245. This figure included employer contributions of $742,308 and employee contributions of $226,457. (Docket Entry # 50-4, p. 15) (Docket Entry # 34, ¶ 22). In 2005, the annual Form 5500 filed with the Secretary had a total income of $2,228,228, a figure that included employer contributions of $1,536,940 and employee contributions of $570,698. (Docket Entry # 50-5, p. 15) (Docket Entry # 34, ¶ 22). A 2005 valuation as of August 15, 2006, by National Retirement Plan Advisors, Inc. showed employer contributions owed to the Plan in the amount of $1,532,840.82. (Docket Entry # 35, ¶ 25). The valuation reflected total contributions of $2,107,637.69 and allocated the contribution "as follows: annual employer contribution $1,222,909.07, QNEC Failsafe contribution $315,030.75, 401(k) contributions $538,460.71 [and] 401(k) catchup contributions $30,237.16." (Docket Entry # 35, ¶ 24). "The last remittance" for the 2005 Plan year "occurred on September 15, 2006," when "the Employer contributed the balance owed to the Plan in the amount of $1,532,840.82." (Docket Entry # 34, ¶ 24) (Docket Entry # 50, ¶ 24)[18] (Docket Entry # 35, ¶

_____

evidence that these "profit sharing" benefits were irrevocable.

[18] Defendant disputes the statement only to the extent it "characterizes the terms of the employment agreements as 'salary reduction agreements.'" (Docket Entry # 50, ¶ 24).

27).  In short, up until January 1, 2006, NRIAA and the

participating subsidiary companies remitted the contributions to

the Plan on an annual basis "after the close of the Plan Year."[19]

 (Docket Entry # 34, ¶ 23) (Docket Entry # 50, ¶ 23).

In 2006 and 2007, however, participating employers did not

make any fixed contributions of 3% into employee QNEC

subaccounts.  (Docket Entry # 36-4, p. 11).  "The Plan's 2006

Valuation dated May 7, 2008," similarly showed that "the 3% QNEC

Failsafe contribution was not paid by December 31, 2007," and an

annual employer contribution of zero.  (Docket Entry # 35, ¶

31).  Likewise, participating employers did not make the

deferred salary contributions noted in the employee contracts or

any employer discretionary contributions for the 2006 and 2007

Plan years.  (Docket Entry # 36-4, p. 11) (Docket Entry # 34, ¶

25) (Docket Entry # 50, ¶ 25).[20]  In 2007, the 15% contributions

_____

[19]  Defendant disputes the statement only to the extent it
"characterizes the terms of the employment agreements as 'salary
reduction agreements.'"  (Docket Entry # 50, ¶ 23).

[20]  Citing defendant's answers to interrogatories, paragraph
25 in the Secretary's LR. 56.1 statement states that, "No
contributions under the deferred salary arrangement were remitted
to the Plan for Plan Years 2006, 2007 and 2008."  (Docket Entry #
34, ¶ 25).  In addition to acknowledging the absence of fixed
employer contributions of 3%, the cited interrogatory answer
states that defendant "determined that the Company was unable to
make a Discretionary Employer Contribution in 2006 and 2007."
(Docket Entry # 36-4, p. 11).  Defendant disputes paragraph 25
only to the extent it "characterizes the terms of the employment
agreements as 'salary reduction agreements.'"  (Docket Entry #
50, ¶ 25).  Hence, the parties agree that there were no employer
contributions of the deferred salary noted in the employee
contracts for the 2006 and 2007 Plan years, including the 15%

set out in a number of the employment contracts "were reduced to 6%." (Docket Entry # 34, ¶ 27) (Docket Entry # 50, ¶ 27).[21]

Defendant "did not take any income in 2007 [or] 2008" and "left all the money in the company," according to his deposition testimony. (Docket Entry # 50-7, p. 10). He further testified that "all of the wages that I got in 2007, I returned to the company." (Docket Entry # 50-7, p. 10). In answer to an interrogatory, however, defendant indicated that he received a salary of $519,000 for 2007.[22] In his deposition, he testified took a salary of $700,000, paid taxes of approximately $200,000 and put the remaining $500,000, which he initially borrowed from an individual, into a bank account for one of the subsidiary companies. He then took out cashiers checks to pay a number of employees, according to his deposition testimony. (Docket Entry # 50-7, p. 12) (Docket Entry # 54-3). NRIAA loaned defendant $51,369 in 2007 and $98,332 in 2008. Defendant used these funds in part for personal expenses.

_____

contributions reflected in a number of the contracts. As an aside, defendant's reference to page 39 of his deposition (Docket Entry # 49, p. 4) to show an inability to borrow funds in 2007 is not in the record.

[21] Defendant disputes paragraph 27 to the extent it "characterizes the terms of the employment agreements as 'salary reduction agreements'" and notes that "[t]he employment contracts refer to the contributions as 'Profit Sharing Contributions.'" (Docket Entry # 50, ¶ 27). He does not dispute the reduction of the contributions to 6%.

[22] The interrogatory answer is phrased as receiving a "W-2 from NRIAA of $519,000 for 2007." (Docket Entry # 36-4, p. 11).

24

Effective January 1, 2008, an adoption agreement terminated the employer fixed contributions of 3%. (Docket Entry # 35, ¶ 20) (Docket Entry # 50, ¶ 7) (Docket Entry # 55, ¶ 7). In November 2008, defendant wrote a $5,000 check payable to his wife from NRIAA's bank account. (Docket Entry # 54-1, p. 2) (Docket Entry # 54-5, p. 4).

In January 2009, a $998 check payable to Anesthetics of Massachusetts P.C. was deposited into the account of New England Pain Associates P.C. (Docket Entry # 54-2). Defendant surmised that the latter company likely made an "extra payment" on behalf of the former company. (Docket Entry # 54-2). In March 2009, checks in the amount of $31,000 and $125,000 payable to one subsidiary company (Aesthetics of Brockton P.C.) were deposited into the account of another subsidiary company (New England Pain Associates P.C.). In April and May 2009, there were three international wire transfers from Anesthetics of Brockton P.C.'s bank account in the amounts of $3,000, $13,000 and $13,000. (Docket Entry # 54-1). In May 2009, there was a $37,150 payment for payroll of four subsidiary companies made without the approval of the Trustee in the Anesthetics of Worcester P.C.'s bankruptcy proceeding. (Docket Entry # 54-6). At and around the time of the payment, defendant's accountants failed to provide supporting documentation repeatedly requested by an official at the accounting firm representing the Committee of

Unsecured Creditors in defendant's chapter 11 bankruptcy proceeding. (Docket Entry # 54-6). In a June 2009 affidavit, she attested that, "[T]here has been repeated commingling of funds and expenses between" defendant and related subsidiary companies. (Docket Entry # 54-6, ¶ 50).

DISCUSSION

## I. ERISA

The Secretary moves for summary judgment as to liability under sections 1104(a)(1)(A), 1104(a)(1)(B), 1106(a)(1)(D), 1106(b)(1) and 1106(b)(2)[23] and seeks damages in the amount of $1,170,986 based on the failure to make the required contributions under the aforementioned 31 employee contracts. The Secretary argues that defendant violated his fiduciary duties and engaged in prohibited transactions by failing to remit and/or allowing NRIAA or the subsidiary companies to retain participant contributions after they became Plan assets. (Docket Entry # 32). The Secretary submits that salary reductions for contribution to the Plan in the employee contracts constitute employee elected deferrals of salary which became Plan assets "as soon as the funds '[could] reasonably be segregated.'" (Docket Entry # 33) (quoting 29 C.F.R. § 2510.3-

---

[23] Although the complaint sets out a cause of action under section 1106(a)(1)(B), the Secretary only briefly cites and does not develop an argument relative to liability under this section. (Docket Entry # 33).

102(a)(1)).[24]

Defendant argues that, based on the unambiguous language of
Plan documents which allow only discretionary employer
contributions, the contributions are not Plan assets until the
employer deposited them into the Plan.  In the alternative,
defendant submits it is a material issue of fact as to whether
the contributions are employer discretionary contributions or
employee elective deferred compensation because the employee
contracts have varying terms and language depicting the nature
of the contributions.  For example, defendant points out that
"some of the employee contracts state" that 15% "'will be
contributed to the Employer's Profit Sharing Plan,'" other
contracts simply state, "Retirement Plan.  On the same terms and
conditions as other participating employees of the Employer's
Plan." (Docket Entry # 49).

---

[24]  In contrast to the above ERISA regulation (29 C.F.R. §
2510.3-102(a)(1)), the Tax Code classifies employee elected
deferrals of compensation in a different manner.  In particular,
employee elective contributions are treated as pre-tax *employer*
contributions by the Internal Revenue Service.  The relevant
regulation reads as follows:

> (ii) Treatment of elective contributions as employer
> contributions.  Except as otherwise provided in §
> 1.401(k)-2(b)(3), elective contributions under a qualified
> cash or deferred arrangement (including designated Roth
> contributions) are treated as employer contributions.  Thus,
> for example, elective contributions under such an
> arrangement are treated as employer contributions for
> purposes of sections 401(a), 401(k), 402, 404, 409, 411,
> 412, 415, 416, and 417.

26 C.F.R. § 1.401(k)-1(a)(4); see also Howard E. Clendenen, Inc.
v. C.I.R., 207 F.3d 1071, 1073-1074 (8th Cir. 2000).

Before addressing the crux of the parties' dispute, i.e., whether the contributions are employer discretionary contributions or employee elective deferred compensation, this court turns to the bases for liability. ERISA allows the Secretary to bring a civil action to obtain "relief under section 1109." 29 U.S.C. § 1132(a)(2). Section 1109 creates liability against a fiduciary "who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries" under, inter alia, sections 1104 and 1106. 29 U.S.C. § 1109(a). Defendant admits and Plan documents provide that he is a fiduciary under the Plan.

The Secretary first submits that, by failing to remit participant contributions to the Plan, defendant violated his fiduciary duty of not acting "solely in the interest of the participants," 29 U.S.C. § 1104(a)(1), or "with the care, skill, prudence and diligence under the circumstances" of "a prudent man," 29 U.S.C. § 1104(a)(1)(B). Under section 1104, a fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of . . . providing benefits to participants." 29 U.S.C. § 1104(a)(1). A fiduciary must also "act with '"the care, skill, prudence and diligence that a prudent man acting in a like capacity and familiar with such matters would use."'" <u>Bunch v. W.R. Grace & Co.</u>, 555 F.3d 1, 7

(1st Cir. 2009) (quoting <u>Beddall v. State St. Bank & Trust Co.</u>,
137 F.3d 12, 18 (1st Cir. 1998) (quoting 29 U.S.C. §
1104(a)(1)(B)) (ellipses omitted).  Trustees, such as defendant,
therefore "have a fiduciary duty to 'act to ensure that a plan
receives all funds to which it is entitled, so that those funds
can be used on behalf of participants and beneficiaries.'"
<u>Holdeman v. Devine</u>, 572 F.3d 1190, 1193 (10th Cir. 2009) (quoting
<u>Central States, Southeast & Southwest  Areas Pension Fund v.
Central Transport, Inc.</u>, 472 U.S. 559, 571 (1985)).  Indeed,
"[o]ne of the fundamental" or main duties at common law "of a
trustee is to preserve and maintain trust assets."  <u>Central
States, Southeast & Southwest  Areas Pension Fund v. Central
Transport, Inc.</u>, 472 U.S. at 572.  A trustee is therefore
"expected to 'use reasonable diligence . . . to take control of
[trust property] without unnecessary delay.'"  <u>Id.</u>

     Even though section 1104(a)(1) imposes these fiduciary
duties, defendant relies on Plan language that absolves the
trustee of responsibility to collect funds paid by the employer.
(Docket Entry # 49).  The relevant language in the Plan states
that, "The trustee shall not be responsible for the collection
of any funds required by the Plan to be paid by the employer to
the Trustee."  (Docket Entry # 36-5, § 19.02).  "[T]rust
documents," however, "cannot excuse trustees from their duties
under ERISA."  <u>Id.</u> at 568; <u>see</u>, <u>e.g.</u>, <u>Solis v. Plan Benefit</u>

<u>Services, Inc.</u>, 620 F.Supp.2d 131, 138-139 & n.3 (D.Mass. 2009)
(declining to enforce similar exculpatory clause).  In addition,
ERISA explicitly provides that, except for the provisions in
sections 1105(b)(1) and 1105(d), "any provision in an agreement
or instrument which purports to relieve a fiduciary from
responsibility or liability for any responsibility, obligation,
or duty under this part shall be void as against public
policy."[25]  29 U.S.C. § 1110(a).  Those duties, as explained
above, include a duty to collect funds to which a plan is
entitled.  Accordingly, defendant's reliance on the language of
section 19.02 is misplaced.

In addition to defendant's failure to remit participant
contributions in violation of section 1104(a)(1), the Secretary
submits that defendant engaged in the prohibited transactions of
transferring Plan assets to parties in interest in violation of
sections 1106(a)(1)(D) by allowing NRIAA and/or subsidiary
companies to retain participant contributions after they became
Plan assets.  Section 1106 prescribes prohibited transactions on
the part of a fiduciary or a party in interest.  As already
noted, defendant admits that he is a fiduciary and a party in
interest.  Section 1106(a)(1)(D) bars a fiduciary from causing

_____

[25]  Section 1105(b)(1) does not apply because there is only
one trustee, i.e., defendant.  To the extent defendant relies on
an investment manager under section 1105(d), the issue here is
whether contributions and Plan assets were collected as opposed
to properly invested.

"the plan to engage in a transaction" that constitutes a

"transfer to, or use by or for the benefit of a party in

interest, of any *assets of the plan*." 29 U.S.C. § 1106(a)(1)(D)

(emphasis added). For example, causing a plan to pay

unauthorized administrative expenses to a party in interest

contravenes section 1106(a)(1)(D). See <u>Chao v. Malkani</u>, 452

F.3d 290, 296 (4th Cir. 2006).

The Secretary also relies on sections 1106(b)(1) and (2) as

a basis for liability. He contends that by failing to ensure

the deposit of employees' deferred compensation into the Plan

and allowing NRIAA and/or the subsidiary companies to retain the

contributions, defendant violated sections 1106(b)(1) and (2) by

"deal[ing] with the assets of the plan in his own interest," 29

U.S.C. § 1106(b)(1), and/or engaging in "transaction[s]

involving the plan on behalf of" NRIAA or the subsidiary

companies "whose interests are adverse to the interests of the

plan or its participants," 29 U.S.C. § 1106(b)(2). Prohibited

transactions under section 1106(b)(1) extend to dealing "with

the assets of the plan" for the fiduciary's "own interest or for

his own account." 29 U.S.C. § 1106(b)(1). Prohibited

transactions under section 1106(b)(2) arise when the fiduciary

acts in any transaction involving the plan on behalf of a party

"whose interests are adverse to the interests of the plan." 29

U.S.C. § 1106(b)(2). For instance, a fiduciary violates section

1106(b)(1) by transferring plan assets to a personal bank account and using "those assets to satisfy personal and/or corporate debts." Chao v. Nguyen, 2007 WL 2461046, at *1 (D.Mass. Aug. 24, 2007). In fact, such expenditures are "the type of self-dealing and misuse of plan assets that courts have repeatedly found to be clear violations" of section 1106(b)(1). Id. (collecting cases); see also Danza v. Fidelity Management Trust Co., 533 Fed.Appx. 120, 126 n.5 (3rd Cir. 2013) ("406(b) has been found to prohibit transactions involving kick-backs to fiduciaries and self-negotiated loans").[26] Such conduct likewise transgresses sections 1106(a) and 1106(b)(2). Id. at *1-2. Conversely, no liability exists for self-dealing in plan assets under section 1106(b)(2) if the contributions are not plan assets. See Vander Luitgaren v. Sun Life Assurance Co. of Canada, 765 F.3d 59, 63 (1st Cir. 2014) (discussing Merrimon v. Unum Life Insurance Co., 758 F.3d 46 (1st Cir. 2014), cert. denied, 135 S.Ct. 1182 (2015), that because funds never became plan assets, "'there was no showing of self-dealing in plan assets sufficient to ground a section 406(b) claim'") (brackets omitted).

In sum, the Secretary argues that defendant failed to remit participant contributions to the Plan in violation of his

---

[26] Rule 32.1, Fed. R. App. Pro., allows citations of unpublished opinions issued on or after January 1, 2007.

fiduciary duties under sections 1104(a)(1)(A) and (B) and he
allowed NRIAA and the subsidiary companies to retain participant
contributions after they became Plan assets in violation of
sections 1106(a)(1)(D) and 1106(b)(1) and (2). (Docket Entry #
33, pp. 4-5). All of these arguments depend upon a finding that
defendant failed to remit Plan assets, dealt with Plan assets as
a fiduciary, transferred Plan assets to a party in interest or
allowed the companies to retain Plan assets. In fact, section
1106(a)(1)(D) and 1106(b)(1) both use the term "assets of the
plan."

ERISA does not define what constitutes "plan assets."[27]
Bannistor v. Ullman, 287 F.3d 394, 402 (5th Cir. 2002); accord
Merrimon v. Unum Life Insurance Co. of America, 758 F.3d at 56
("ERISA nowhere contains a comprehensive definition of what
constitutes 'plan assets'"). The statute, however, does state
that, "[T]he term 'plan assets' means plan assets as defined by
such regulations as the Secretary [of Labor] may prescribe." 29
U.S.C. § 1002(42); see Secretary of Labor v. Doyle, 675 F.3d
187, 203 (3rd Cir. 2012) (citing 29 U.S.C. § 1002(42) and 29

---

[27] ERISA refers to assets of a plan to define fiduciary
status, 29 U.S.C. § 1002(21)(A), and standards of conduct, 29
U.S.C. §§ 1106(a)(1)(D), 1106(B)(1) and 1103(c)(1). "'The normal
rule of statutory construction assumes that "identical words used
in different parts of the same act are intended to have the same
meaning."'" U.S. v. Lachman, 387 F.3d 42, 55-56 (1st Cir. 2004)
(quoting Sorenson v. Secretary of the Treasury, 475 U.S. 851, 860
(1986)).

C.F.R. § 2510.3-102); see also 26 C.F.R. § 1.401(k)-1.[28]  The

Department of Labor, which is "the agency charged with

administering and enforcing Title I of ERISA, has officially

issued a regulation that specifies when employee contributions

become assets."  In re Halpin, 566 F.3d 286, 289 (2nd Cir. 2009)

(citing 29 C.F.R. § 2510.3-102).  The regulation, 29 C.F.R. §

2510.3-102 ("regulation 2510.3-102"), defines "plan assets" to

include the amount "a participant has withheld from his wages by

an employer[] for contribution to the plan . . .."  29 C.F.R. §

2510.3-102 (2007); In re Halpin, 566 F.3d at 289; Bannistor v.

Ullman, 287 F.3d at 402.  In pertinent part, it reads as

follows:

> (a)(1) General rule.  For purposes of subtitle A and parts
> 1 and 4 of subtitle B of title I of ERISA . . .,[29] the
> assets of the plan include amounts (other than union dues)
> that a participant or beneficiary pays to an employer, or

---

[28] The above treasury regulation reads as follows:

The extent to which elective contributions constitute plan
assets for purposes of the prohibited transaction provisions
of section 4975 and title I of the Employee Retirement
Income Security Act of 1974 (88 Stat. 829), Public Law
93-406, is determined in accordance with regulations and
rulings issued by the Department of Labor.  See 29 CFR
2510.3-102.

26 C.F.R. § 1.401(k)-1.

[29] Title I of ERISA, 29 U.S.C. § 1001 et seq., includes the
provisions in part four governing fiduciary standards and
responsibilities, 29 U.S.C. §§ 1101-1114.  See Nachman Corp. v.
Pension Benefit Guaranty Corp., 446 U.S. 359, 362 (1980) ("Title
I of ERISA, § 2 et seq., 29 U.S.C. § 1001 et seq., . . .
establishes standards of fiduciary conduct for plan
administrators").

> amounts that a participant has withheld from his wages by
> an employer, for contribution to the plan as of the
> earliest date on which such contributions can reasonably be
> segregated from the employer's general assets.

29 C.F.R. § 2510.3-102 (2007). Thus, for purposes of

determining fiduciary obligations under part four of Title I of

ERISA, funds designated by an employee for contribution to a

plan are assets of the plan once they are withheld from

employees' paychecks as of the earliest date that the funds can

be segregated from the employer's general assets.[30] 29 C.F.R. §

2510.3-102. The regulation sets a maximum date for the employer

to segregate the funds of "the 15th business date of the month

following the month in which such amounts would otherwise have

been payable to the participant in cash (in the case of amounts

withheld by an employer from a participant's wages)." 29 C.F.R.

§ 2510.3-102(b)(1). Finally, the regulation is "based on and is

consistent with the provisions of ERISA which require that plan

assets be held in trust" U.S. v. Grizzle, 933 F.2d 943, 947 n.3

(11th Cir. 1991).

The regulation therefore establishes that employee wages

withheld from an employee's salary are plan assets. Moreover,

although the issue is one of first impression in the First

Circuit, the Second, Fifth, Seventh, Eighth and Eleventh

---

[30] It is not necessary to address the question of whether
the funds are also assets of the plan between the time they are
withheld and prior to segregation.

35

circuits universally conclude that participant contributions of
compensation withheld from an employee's wages for deposit into
a plan are assets of the plan. See Finkel v. Romanowicz, 577
F.3d 79, 86 n.8 (2nd Cir. 2009) (although employer "failed to
remit withheld employee wages" to plan administrator to deposit
into plan, "District Court correctly concluded those funds
nevertheless became 'assets' of the plan"); Trustees of the
Graphic Communications International Union Upper Midwest Local
1M Health and Welfare Plan v. Bjorkedal, 516 F.3d 719, 733 (8th
Cir. 2008) (funds were plan assets once withheld from employees'
paychecks); U.S. v. Whiting, 471 F.3d 792, 799 (7th Cir. 2006);
Bannistor v. Ullman, 287 F.3d at 402; United States v.
LaBarbara, 129 F.3d 81, 88 (2nd Cir. 1997); LoPresti v.
Terwilliger, 126 F.3d 34, 39 (2nd Cir. 1997) (citing regulation
2510.3-102(a) and finding it "undisputed that the employees'
contributions to the Funds . . . were plan assets"); see also
Phelps v. CT Enterprises, 2006 WL 2310665, at *3 (4th Cir. Aug.
9, 2006) (acknowledging that contributions withheld from
employees' paychecks were plan assets); Pepicelli v. Fall River
Shirt Co., Inc., 2010 WL 3749453, at *2 (D.Mass. Sept, 21, 2010)
("plan assets include employee contributions withheld from
employee paychecks"); see generally Kenney v. Roland Parson
Contracting Corp., 28 F.3d 1254, 1258-1259 (D.C.Cir. 1994)
("employer's representation that a plan has been established, in

conjunction with any action, such as withholding wages for contribution to such a plan," outweighs "employer's failure formally to establish a plan").

Furthermore, they constitute employee contributions under ERISA even though the employer never actually deposits the withheld wages into the plan.  See <u>U.S. v. Whiting</u>, 471 F.3d at 799 ("unremitted employee contributions, including employee contributions withheld from employee paychecks that have not been delivered to their intended benefit plans, can be plan assets"); <u>Bannistor v. Ullman</u>, 287 F.3d at 402 (plan assets "'include employee contributions to benefit plans which are withheld from employees' paychecks and for deposit into their benefit plans, even though the contributions have not actually been delivered to the benefit plan'"); <u>United States v. LaBarbara</u>, 129 F.3d at 88; <u>LoPresti v. Terwilliger</u>, 126 F.3d at 39-40 (wages withheld from paychecks for deposit into fund were plan assets); <u>United States v. Grizzle</u>, 933 F.2d at 946 (employee's elective contributions to plan withheld from wages are "plan assets" even if funds remain in employer's possession); <u>see</u> <u>also</u> <u>In re Luna</u>, 406 F.3d 1192, 1200-1201 (10th Cir. 2005) ("contractual right to the unpaid [fringe benefit employer] contributions is an 'asset' under ERISA"); <u>Board of Trustees of Airconditioning and Refrigeration Industry Health and Welfare Trust Fund v. J.R.D. Mechanical Services, Inc.</u>, 99

37

F.Supp.2d 1115, 1120 (C.D.Cal. 1999) ("wage deductions intended as plan contributions are plan assets, regardless of whether such money is ever in fact conveyed to the plan").

In contrast, unremitted discretionary employer contributions do not become assets of a plan until deposited into the plan. See In re Halpin, 566 F.3d at 290 (agreeing with Department of Labor's "interpretation that employer contributions become assets only after being paid"); In re Luna, 406 F.3d at 1199-1200.[31] Either way, the parties agree that discretionary employer contributions do not become plan assets until deposited into the Plan. (Docket Entry # 33) ("employer contributions do not become plan assets until the contribution is made") (Docket Entry # 49) ("employer contributions do not constitute plan assets until they are paid to the plan").

------

[31] Department of Labor regulations do not address whether unremitted employer contributions are plan assets. In re Halpin, 566 F.3d at 289 (Department of Labor "has not issued a formal rule governing when *employer* contributions become plan assets") (emphasis in original); Cadegan v. McCarron, 2002 WL 1796971, at *2 (D.N.H. Aug. 6, 2002) ("Secretary of Labor's regulations do not address contributions made or owed by an employer"). "In the absence of a formal rule or regulation," plan assets "'are to be identified on the basis of ordinary notions of property rights under non-ERISA law.'" In re Halpin, 566 F.3d at 289 (quoting U.S. Department of Labor, Advisory Opinion No. 93-14A, 1993 WL 188463, at *4 (May 5, 1993)). This was the approach taken by the First Circuit in Merrimon in determining whether funds in retained asset accounts in an insurer's general account to pay death benefits were "assets of the plan" within the meaning of section 1106(b). See Merrimon v. Unum Life Insurance Co. of America, 758 F.3d at 56-57 (finding Department of Labor's formulation based on property rights in the advisory opinion "persuasive").

Defendant argues that the Plan documents do "not permit employee elective deferrals other than to individual 401(k) accounts" and that "Plan Documents clearly characterize the contributions as employer contributions." (Docket Entry # 49). According to defendant, the Plan does not provide "for additional employee elective deferrals." (Docket Entry # 49). Reasoning that the Plan documents are unambiguous, defendant submits that the contributions are not assets of the Plan and he is entitled to summary judgment in his favor. (Docket Entry # 49).

First and foremost, the argument ignores the foregoing law that establishes that withheld wages of an employee designated for contribution to a plan are assets of that plan as of the earliest date that the amounts can be segregated from the employer's general assets. As explained below, 12 of the 31 contracts state that 15% of the employee's salary will be deducted from his or her salary and contributed to the Plan.

Second, the language of the Plan supports the construction given the term "assets of the plan" under regulation 2510.3-102. The Plan does not define what constitutes an "asset" of the Plan. Section 21.03, however, unequivocally states that, "This Plan shall be construed and enforced according to ERISA." (Docket Entry # 36-5, § 21.03). ERISA, as noted above, mandates that "the term 'plan assets' means plan assets as defined by

39

such regulations as the Secretary may prescribe," 29 U.S.C. § 1002(42), see Secretary of Labor v. Doyle, 675 F.3d at 203, and regulation 2510.3-102 unequivocally states that withheld wages designated for contribution are Plan assets as soon as the amounts "can reasonably be segregated." 29 C.F.R. § 2510.3-102. Construing the Plan "according to ERISA" (Docket Entry # 36-5, § 21.03) therefore dictates that the withheld wages designated for contribution to the Plan in the employee contracts are assets of the Plan. See also Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc., 472 U.S. at 568 ("trust documents must generally be construed in light of ERISA's policies").

It is true that the Plan allows for discretionary employer contributions in article six. (Docket Entry # 36-5, § 6.01). The Plan also allows for traditional 401(k) cash or deferred arrangements in the form of employee deferrals of compensation in article five. (Docket Entry # 36-5, §§ 5.01-5.03). Article seven of the Plan sets out corresponding matching or QNEC fixed contributions by the employer. (Docket Entry # 36-5, §§ 7.01, 7.02(c)).

The Plan documents nevertheless do not expressly limit the language in article five to traditional 401(k) cash or deferred arrangements. Section 5.01 broadly states that, "The Employer shall contribute an amount equal to the amount by which an

Active Participant elects to reduce the Compensation which would otherwise be paid to him."  (Docket Entry # 36-5, § 5.01).  The adoption agreement effective July 2003 likewise states that, "The Employer shall contribute the amount by which an eligible Participant has elected to have Compensation deferred."[32] (Docket Entry # 36-9, p. 3).  Under the heading "Contributions by the Employer," section 4.01 states that, "[T]he Employer's contribution will not be less than the amounts needed . . . to contribute the amount of any Elective Deferrals [and] to make any Fixed Contribution described in Section 7.02(c)."[33]  (Docket Entry # 36-5, § 4.01).

Accordingly, the language of the Plan in article five that applies to traditional 401(k) elections extends, at a minimum, to the 15% salary deductions and contributions in the following 12 employee contracts.[34]  The relevant benefit in each of these

---

[32]  An eligible participant is an "Employee who meets the requirements specified in Section B of the Adoption Agreement." (Docket Entry # 36-5, § 3.02(a)).  Section B sets out age and service requirements for an employee to participate in the Plan. (Docket Entry ## 36-6, 36-8).

[33]  The Plan defines "Elective Deferrals" as simply, "Any Employer contributions made to the Plan at the election of a Participant in lieu of cash Compensation."  (Docket Entry # 36-5, § 1.16).  The definition further states that, "This term shall include contributions made pursuant to a salary reduction agreement or other deferral mechanism."  (Docket Entry # 36-5, § 1.16).

[34]  In the event of an excess deferral, the Plan provides that elective deferrals may not exceed the amounts in section 402(g) with respect to any taxable year.  (Docket Entry # 36-5, § 1.16).  The occurrence of elective deferrals in excess of this

41

contracts, although labeled as a "Profit Sharing Plan" or as a "Retirement Plan," unequivocally states that 15% of the physician's salary "will be deducted" from the physician's salary or compensation package and "contributed" to the Plan. (Docket Entry ## 37, 37-1, 37-6, 37-9, 37-12, 38-3, 38-8, 38-9, 39-2, 39-5, 39-11, 39-12).[35]  The arrangements under these contracts fall squarely within the language of the regulation and within the reach of the language of the Plan documents.  The contributions therefore became Plan assets "as of the earliest date on which such contributions can reasonably be segregated from the employer's general assets."  29 C.F.R. § 2510.3-102 (2007).

In 2006 and 2007, defendant, as a fiduciary and the only named trustee, did not ensure that NRIAA or the subsidiary companies contributed these withheld wages to the Plan.  At best, the record, viewed in defendant's favor, shows that he

_____

amount does not disqualify the Plan.  <u>See</u> Boris I. Bittker and Lawrence Lokken <u>Federal Taxation of Income, Estates and Gifts</u> ¶ 62.1 (3rd ed. 1999) ("A plan receiving elective deferrals can be qualified only if it states that the deferrals may not exceed the § 402(g) ceiling, but the occurrence of excess deferrals does not affect the plan's qualification.").  The amount of excess deferrals is ordinarily treated as gross income for the taxable year in which the deferrals were made.  <u>See</u> 26 C.F.R. § 1.402(g)-1(a).

[35]  The remaining four contracts that provide for a 15% contribution do not unambiguously establish the contribution as a deduction from the employees' salary, i.e., "amounts that a participant has withheld from his wages" within the meaning of regulation 2510.3-102.  (Docket Entry ## 38-2, 39-3, 39-6, 39-8).

42

worked long hours and deposited the net proceeds of his 2007 salary into the bank account of one of the subsidiary companies (New England Pain Associates P.C.) to pay "the people, or they wouldn't go to work." (Docket Entry # 54-3).

A trustee such as defendant has a fiduciary duty "to ensure that a plan receives all funds to which it is entitled, so that those funds can be used on behalf of participants and beneficiaries." Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc., 472 U.S. at 571. Although "[t]he steps necessary to discharge a duty to collect contributions will depend on the circumstances," Holdeman v. Devine, 572 F.3d at 1193, a fiduciary does not act solely in the interest of participants when he completely fails to ensure that the Plan receives the contributions to which it is entitled.[36] See Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc., 472 U.S. at 571 (noting that trustee must "act to ensure that a plan receives all funds to which it is entitled, so that those funds can be used on behalf of participants"). Likewise, a fiduciary, such as defendant, does not act prudently under section 1104(a)(1)(B) when he fails to make any attempt to collect assets of the Plan and deposit them into the Plan in a timely manner. See id.; see also Holdeman v.

---

[36] Using Plan assets to pay operating expenses, including salaries of unidentified employees, also does not ensure that the Plan receives the funds to which it is entitled.

Devine, 572 F.3d at 1193-1194 ("trustee breaches his duty when he fails to consider his obligations to collect delinquent contributions"); see, e.g., In re Dombek, 2012 WL 4757832, at *5 (Bkrtcy.N.D.Ill. Oct. 5, 2012) ("duties of loyalty and care include the requirement that plan fiduciaries ensure that participant contributions are remitted and timely remitted to the plan" and fiduciary therefore violated section 1104(a)(1) "by retaining Plan assets in WTSC's general assets for" operating expenses). Accordingly, by failing to remit the withheld wages in these 12 employee contracts[37] in 2006 and 2007 to the Plan or by allowing NRIAA or the subsidiary companies to retain them in their general accounts, defendant violated his fiduciary duties under ERISA to act solely in the interest of Plan participants under section 1104(a)(1)(A) and with the care and skill of a prudent man under section 1104(a)(1)(B).

As a final matter, citing 26 C.F.R. § 1.401(k)-1(a)(3)(v), the Secretary summarily states that, "Because participants did not make one-time, irrevocable elections, as demonstrated, the elective contributions qualified as a *bona fide* Deferred Arrangement under the [Tax Code]." (Docket Entry # 33, p. 14). The Secretary does not explain the relevance of such irrevocability under the Tax Code regulations as a basis to

---

[37] (Docket Entry ## 37, 37-1, 37-6, 37-9, 37-12, 38-3, 38-8, 38-9, 39-2, 39-5, 39-11, 39-12).

44

preclude liability under ERISA.[38]  Defendant does not address the

argument.  The plain language of regulation 2510.3-102 makes no

mention of irrevocability and the terms of the Plan fully

address the contributions.  There is also a dearth of authority

addressing whether the irrevocable nature of a cash or deferred

arrangement under 26 C.F.R. § 1.401(k)-1(a)(3)(v) precludes

either a finding that the contributions constitute Plan assets

under regulation 2510.3-102 or liability under sections

1104(a)(1)(A) and (B).

The Plan and ERISA regulation 2510.3-102, as opposed to the

Treasury's regulation, 26 C.F.R. § 1.401(k)-1(a)(3)(v),

---

[38]  Tax regulations provide that certain one time,
irrevocable employee elections are not cash or deferred elections
under section 401(k).  26 C.F.R. § 1.401(k)-1(a)(3)(v); see also
26 C.F.R. § 1.402(g)-1; 26 C.F.R. § 1.401(k)-1(e)(2)(ii)
(employee should be able to make or change "a cash or deferred
election at least once during each plan year").  As summarized by
one commentator:

> To qualify under § 401(k), a plan must provide each
> participating "employee with an effective opportunity to
> make (or change) a cash or deferred election at least once
> during each plan year."  Generally, a plan only allowing
> less frequent elections is a nonqualified cash-or-deferred
> arrangement, and participants electing deferral under such
> an arrangement are immediately taxed on amounts they could
> have taken in cash.  However, a "one-time irrevocable
> election" is not a cash-or-deferred election if it is made
> on or before the date an employee first becomes eligible to
> participate in a qualified pension, profit-sharing, stock
> bonus, or annuity plan of the employer and establishes the
> employee's rights to benefits "for the duration of the
> employee's employment with the employer."

Boris I. Bittker and Lawrence Lokken Federal Taxation of Income,
Estates and Gifts ¶ 62.1 (3rd ed. 1999) (quoting 26 C.F.R. §§
1.401(k)-1(e)(2)(ii) & 1.401(k)-1(a)(3)(v)).

constitute the primary means to ascertain whether the contributions are Plan assets that render defendant liable under section 1104(a)(1).  See generally In re Sewell, 180 F.3d 707, 711 (5th Cir. 1999) ("[a]n ERISA plan that is not or may not be tax qualified nevertheless continues to be governed by ERISA for essentially every other purpose"); United Steelworkers of America, AFL-CIO and Its Local 4805 v. Harris & Sons Steel Co., 706 F.2d 1289, 1298-1299 (3rd Cir. 1983); U.S. v. Jewell, 538 F.Supp.2d 1087, 1091 (E.D.Ark. 2008) ("[t[he difficulty with the argument made by the United States is that it confuses the requirements of ERISA with the prerequisites for achieving tax qualification for an ERISA plan").  Inasmuch as the Secretary's argument confuses tax qualifications with ERISA liability under sections 1104(a)(1)(A) and (B), the provisions of 26 C.F.R. § 1.401(k)-1(a)(3)(v) do not eliminate defendant's liability under sections 1104(a)(1)(A) and (B).

Having established liability under sections 1104(a)(1)(A) and (B) for the withheld wages in 2006 and 2007 for 12 of the 31 contracts, it is not necessary to address defendant's liability under section 1106 to resolve the Secretary's motion.  As to damages, defendant does not dispute that "[t]he amount due and owing the Plan is $1,170.986.00, based on the Damages Calculation" performed by the DOL Investigator.  (Docket Entry # 34, ¶ 33) (Docket Entry # 50, ¶ 33).  Defendant does dispute whether he is personally responsible for the payment of this

undisputed amount.[39]  (Docket Entry # 50, ¶ 33).

The damages calculation allocates the total damages of $1,170,986 into designated amounts for each of the 31 employees. For the 12 employees in the 12 above contracts with the 15% contributions (Docket Entry ## 37, 37-1, 37-6, 37-9, 37-12, 38-3, 38-8, 38-9, 39-2, 39-5, 39-11, 39-12), the amount totals $402,767.02.

Whether the other 19 employee contracts fall under the reach of regulation 2510.3-102 remains a genuine issue of material fact.  Regulation 2510.3-102 defines "plan assets" as amounts "a participant has withheld from his wages" and, without such withholding, the regulation does not confer plan asset status to the wages.  29 C.F.R. § 2510.3-102; see In re M & S Grading, Inc., 541 F.3d 859, 864 (8th Cir. 2008) (contributions are "not employee contributions because, as the parties agree, the contributions were not withheld from the employee paychecks").  The terms of these 19 employee contracts do not unambiguously depict participant contributions as withheld from the employee's wages.  Thus, defendant points out, correctly, that a number of the remaining employee contracts simply state,

---

[39]  The relevant paragraph in the Secretary's LR. 56.1 statement states that, "The amount due and owing the Plan is $1,170,986.00, based on the Damages Calculation (Appendix)." (Docket Entry # 34, ¶ 33).  Defendant's response states, "Undisputed, except to the extent that Plaintiff alleges Mashali is personally responsible for payment of this amount."  (Docket Entry # 50, ¶ 33).

"Retirement Plan.  On the same terms and conditions as other participating employees of the Employer's Plans."  (Docket Entry ## 37-3, 37-4, 37-7, 37-8, 38, 38-1, 38-4, 38-5, 38-6, 38-7, 38-11, 39-4).  The nature and contours of the referenced retirement plan are not sufficiently established.[40]  An additional contract labels the benefit as a "Profit Sharing Plan" and sets out the same provision.  (Docket Entry # 39-10).  One other contract summarily provides "pension participation on the same terms and conditions as other participating physician employees at cost to Physician."  (Docket Entry # 37-2).

Given the genuine issues of material fact regarding the nature of the contributions in these contracts, the Secretary's request for summary judgment "against Defendant on his claims for liability and damages under ERISA" (Docket Entry # 32) lacks merit as to these 19 contracts.  As to the 12 other contracts,[41] the Secretary's motion reduces to the issues of whether to allow partial relief under Rule 56(g) establishing as fact that:  (1) the contributions in the 12 contracts are "plan assets" under regulation 2510.3-102 as soon as they "can reasonably be segregated"; and/or (2) damages in the amount of $402,767.02 on these 12 contracts.  See Fed.R.Civ.P. 56(a), 56(e)(2) & 56(g).

---

[40]  See footnotes 13 and 14 and related text.

[41]  (Docket Entry ## 37, 37-1, 37-6, 37-9, 37-12, 38-3, 38-8, 38-9, 39-2, 39-5, 39-11, 39-12).

Alternatively, this court could recommend an outright denial of the motion given the genuine issues of material fact regarding the terms of the contracts.

Amendments to Rule 56 in 2010 "extensively" rewrote provisions relative to awarding partial summary adjudication and partial relief. <u>See</u> 10B Charles Alan Wright et al., <u>Federal Practice and Procedure</u> § 2737 (3rd ed. 2015). In particular, the "amended Rule 56(a), which contains the general standard for obtaining summary judgment, now also includes authority for judgment on less than the entire case, denominating such judgments in its title as a 'Partial Summary Judgment.'" <u>Id.</u> In addition, "a new subdivision (g) now contains the authority for a court that fails to grant all the requested relief to enter an order stating "any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case." <u>Id.</u>

Under Rule 56(a), "a party may move for final summary judgment as to a claim, or partial summary judgment as to a 'part of a claim,' such as liability." <u>Finance USA Network.com, Inc. v. Central Transport Intern., Inc.</u>, 2013 WL 3461692, 2 (M.D.Fla.) (M.D.Fla. 2013). Here, the Secretary sought summary judgment on liability, damages and defalcation under Rule 56(a).[42] In both the motion and the supporting memorandum, the

---

[42] As stated in the motion, the Secretary moved, "in accordance with Rule 56(a) of the Federal Rules of Civil

Secretary moved for summary judgment on all of the 31 contracts as a group.  In other words, he did not identify a portion of the 31 contracts and then move for partial summary judgment on those contracts under Rule 56(a).  See Fed.R.Civ.P. 56(a) (motion must "identify[ ] each claim or defense—or the part of each claim or defense—on which summary judgment is sought"); Ortiz-Lebron v. U.S., 945 F.Supp.2d 261, 263 n.3 (D.P.R. 2013); see generally Kuperman v. Wrenn, 645 F.3d 69, 73-74 (1ˢᵗ Cir. 2011) (moving parties have "the initial burden of informing the judge of the basis for their motion and identifying the portions of the record that demonstrate the absence of any genuine issue of material fact").

Where, as here, the Secretary does not obtain all of the relief requested as to liability or damages under Rule 56(a), Rule 56(g) allows the court to "determine if there are material facts which are genuinely not in dispute, and establish those facts as undisputed for trial."  In re Velez Arcay, 499 B.R. 225, 233 (Bkrtcy.D.P.R. 2013).  By its terms, the rule applies when the court fails to grant all of the relief requested in a summary judgment motion.  Fed.R.Civ.P. 56(g).  It reads as follows:

---

Procedure, for Summary Judgment against Defendant on his claims for liability and damages under ERISA" and that "Defendant not be discharged from any consequent debt in his personal bankruptcy." (Docket Entry # 32).

> (g) Failing to Grant All the Requested Relief.  If the
> court does not grant all the relief requested by the
> motion, it may enter an order stating any material
> fact-including an item of damages or other relief-that is
> not genuinely in dispute and treating the fact as
> established in the case.

Fed.R.Civ.P. 56(g) (bolding omitted).  Whereas Rule 56(e)(2)

allows this court to treat a fact as established for purposes of

the summary judgment motion only, Rule 56(g) allows this court

to treat the undisputed fact as established in the case,

including at trial.  See Latin American Music Co. Inc. v. Media

Power Group, Inc., 705 F.3d 34, 39-41 (1st Cir. 2013) (discussing

the distinctions between Rule 56(e)(2) and Rule 56(g)).  The

2010 Advisory Committee's notes to Rule 56(g) nevertheless

caution courts not to interfere with a party's ability to treat

a fact as established for purposes of the motion only.  See

Advisory Committee's Notes to 2010 Amendments ("court must take

care that [the Rule 56(g)] determination does not interfere with

a party's ability to accept a fact for purposes of the motion

only" inasmuch as party may "feel confident" that another fact

"will defeat the motion, and prefer to avoid the cost of

detailed response to all facts stated by the movant").

Given this cautionary tone, awarding partial relief to the

Secretary by treating damages in the amount of $402,767.02 for

the 12 contracts as established for all purposes under Rule

56(g) is not advisable.  Defendant may not have contested the

matter because he was "confident that a genuine dispute as to"

the Plan asset characterization issue would easily defeat the Secretary's motion and wanted to avoid the cost of a more detailed response to the motion. See Advisory Committee's Notes to 2010 Amendments, Subdivision (g).

Likewise, exercising this court's discretion, this court declines to make a Rule 56(g) factual finding for all purposes, including trial, that the contributions in the 12 contracts[43] are Plan assets as soon as they can reasonably be segregated from the employer's general assets.[44] See 29 C.F.R. § 2510.3-102(a)(1)). In light of the above, the Secretary's summary judgment motion as to liability and damages is subject to denial due to the presence of genuinely disputed material facts regarding the terms of the employee contracts.

Turning to defendant's motion and viewing the record in the Secretary's favor, the same genuine issues of material fact relative to the 19 contracts preclude summary judgment in defendant's favor on the ERISA claims for these contracts. Likewise, for purposes of defendant's motion, a finder of fact could easily conclude that the contributions in the remaining 12 contracts became Plan assets "as of the earliest date on which

---

[43] (Docket Entry ## 37, 37-1, 37-6, 37-9, 37-12, 38-3, 38-8, 38-9, 39-2, 39-5, 39-11, 39-12).

[44] It therefore remains entirely the province of the trial judge whether he wishes to render this fact established for purposes of trial.

such contributions can reasonably be segregated from the employer's general assets."  29 C.F.R. § 2510.3-102 (2007).  In the alternative, defendant's motion is untimely.

## II.  <u>Fraud or Defalcation</u>

The Secretary seeks summary judgment on the claim that the debt to the Plan for the ERISA violations is not dischargeable under section 523(a)(4).  Defendant cross moves for summary judgment on the basis that no reasonable factfinder could conclude that he committed a defalcation under section 523(a)(4) and that any judgment is therefore dischargeable.

Under section 523(a)(4), a discharge in a bankruptcy proceeding "does not discharge an individual debtor from any debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  11 U.S.C. § 523(a)(4).  In light of the facts, the parties focus the section 523(a)(4) inquiry on fiduciary capacity as opposed to embezzlement or larceny.  In order to fall within this exception, the creditor must establish by a preponderance of the evidence that:  (1) the debt "result[s] from a fiduciary's defalcation under an express or technical trust"; (2) the debtor "acted in a fiduciary capacity with respect to the trust"; and (3) the debt was caused by a fraud or defalcation "within the meaning of bankruptcy law."  <u>In re Fahey</u>, 482 B.R. 678, 687 (1st Cir. BAP 2012) (internal quotation marks omitted); <u>see</u> <u>In re Baylis</u>, 313 F.3d

9, 19 (1ˢᵗ Cir. 2002) (recognizing that one "large category of
bankruptcy exceptions relies on . . . the type of fault that
caused the debt" and includes the exception in section
523(a)(4)); In re McBride, 512 B.R. 103, 113 (Bkrtcy.D.Mass.
2014) (citing In re Fahey, 482 B.R. at 687, and framing third
element as "debt was caused by a fraud or defalcation within the
meaning of bankruptcy law").[45]

The term fraud in section 523(a)(4) "'means positive fraud,
or fraud in fact, involving moral turpitude or intentional
wrong, as does embezzlement; and not implied fraud, or fraud in
law, which may exist without the imputation of bad faith or
immorality.'" Bullock v. BankChampaign, N.A., 133 S.Ct. 1754,
1759 (2013) (quoting Neal v. Clark, 95 U.S. 704, 709 (1878)).
The term defalcation is "treated similarly" to the term "fraud."
Id. "Thus, where the conduct at issue does not involve bad
faith, moral turpitude, or other immoral conduct, the term"
defalcation "requires an intentional wrong." Id. Intentional
conduct includes:

> not only conduct that the fiduciary knows is improper but
> also reckless conduct of the kind that the criminal law
> often treats as the equivalent.  Thus, we include reckless
> conduct of the kind set forth in the Model Penal Code.
> Where actual knowledge of wrongdoing is lacking, we
> consider conduct as equivalent if the fiduciary
> "consciously disregards" (or is willfully blind to) "a

---

[45]  The First Circuit in Fahey frames the third element as,
"'the transaction in question must be a "defalcation" within the
meaning of bankruptcy law.'"  In re Fahey, 482 B.R. at 687.

substantial and unjustifiable risk" that his conduct will
turn out to violate a fiduciary duty.  ALI, <u>Model Penal
Code</u> § 2.02(2)(c), p. 226 (1985).  <u>See</u> <u>id.</u>, § 2.02 Comment
9, at 248 (explaining that the Model Penal Code's
definition of "knowledge" was designed to include "'wilful
blindness'").  That risk "must be of such a nature and
degree that, considering the nature and purpose of the
actor's conduct and the circumstances known to him, its
disregard involves a gross deviation from the standard of
conduct that a law-abiding person would observe in the
actor's situation." <u>Id.</u>, § 2.02(2)(c), at 226 (emphasis
added).  <u>Cf.</u> <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185,
194, n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (defining
scienter for securities law purposes as "a mental state
embracing intent to deceive, manipulate, or defraud").

<u>Id.</u> at 1759-1760; <u>see also</u> <u>In re Karch</u>, 499 B.R. 903, 907 (10th

Cir. BAP 2013) (after <u>Bullock</u>, "court must find that the debtor

acted with wrongful intent, or, at a minimum, with a conscious

disregard of his or her fiduciary duties").  In short, the

<u>Bullock</u> Court's holding denotes the term defalcation as a state

of mind "involving knowledge of, or gross recklessness in

respect to, the improper nature of the relevant fiduciary

behavior."  <u>Bullock</u>, 133 S.Ct. at 1757.

Here, participating employers did not make contributions

under the employee contracts for the 2006 and 2007 Plan years.

Defendant nevertheless drew a $700,000 salary and paid $200,000

in taxes in 2007.  The Secretary reasons it is illogical to draw

a $700,000 salary and return the net amount of $500,000 to the

company.  Viewing the record in the Secretary's favor and

drawing reasonable inferences for purposes of analyzing

defendant's motion, a factfinder could find that the "wages"

were excessive at a time when the companies were struggling and, notwithstanding defendant's testimony to the contrary, that defendant did not return these wages to the company.  Defendant also took a loan in the amount of $51,369 from NRIAA in 2007.

A factfinder could also easily conclude that defendant knew that the transactions of withholding the employees' wages and not transferring them to the Plan in 2006 and 2007 was improper.[46]  The terms of 12 of the contracts unambiguously required deductions of 15% of the physician's salary and contributions of that amount into the Plan.  In light of defendant's level of control and oversight of NRIAA and the subsidiary companies, a factfinder could easily and readily find that defendant not only knew about the failure to make the transfers but acted intentionally.  Indeed, a factfinder could find that he took an excessive "salary" and the $51,369 loan in lieu of paying these required contributions in breach of his fiduciary duty.  See generally In re Baylis, 313 F.3d at 20 ("defalcation may be presumed from a breach of the duty of loyalty, the duty not to act in the fiduciary's own interest when that interest comes or may come into conflict with the

---

[46]  Because the debt at issue involves the 2006 and 2007 contributions, this court examines the transactions that caused this debt.  The evidence the Secretary submits regarding defendant's conduct, bank accounts and commingling funds in 2009 is therefore not the proper focus.  See generally In re Baylis, 313 F.3d at 20-22.

beneficiaries' interest"). Viewing the entire record, including the Plan documents that address employer contributions and traditional 401(k) contributions, defendant's motion lacks merit.[47]

Whereas the Secretary's motion presents a much closer question, the record is viewed in defendant's favor. During his deposition, defendant testified that he "was generating over $50,000 a week," working "24 hours day, seven days a week" without taking "any wages" and "left all the money in the company." (Docket Entry # 50-7). In 2007, defendant testified that he returned all of the wages he received "to the company." (Docket Entry # 50-7). In light of this and other evidence in the record, the Secretary is not entitled to summary judgment that a fraud or defalcation within the meaning of section 523(a)(4) exists.

## CONCLUSION

In accordance with the foregoing discussion, this court **RECOMMENDS**[48] that the Secretary's summary judgment motion (Docket Entry # 32) and defendant's summary judgment motion (Docket

---

[47] In the alternative, the motion is untimely.

[48] Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which objection is made and the basis for such objection. See Fed.R.Civ.P. 72(b). Any party may respond to another party's objections within 14 days after service of the objections. Failure to file objections within the specified time waives the right to appeal the order.

Entry # 48) be **DENIED**.

                        __/s/ Marianne B. Bowler__
                        **MARIANNE B. BOWLER**
                        United States Magistrate Judge